IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Jennifer L. F.-K.,[1] | ) | C/A No.: 1:23-3727-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Martin O'Malley,[2] | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of the Honorable Bruce Howe Hendricks, United States District Judge, dated August 4, 2023, referring this matter for disposition. [ECF No. 9]. The parties consented to a United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 8].

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2] Martin O'Malley was confirmed by the Senate and sworn in as Commissioner of the Social Security Administration on December 20, 2023. Pursuant to Fed. R. Civ. P. 25(d), he is substituted for Kilolo Kijakazi as a party to this action.

Commissioner of Social Security ("Commissioner") denying the claim for disability insurance benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards. For the reasons that follow, the court affirms the Commissioner's decision.

I.    Relevant Background

A.    Procedural History

On March 30, 2021, Plaintiff protectively filed an application for DIB in which she alleged her disability began on August 10, 2020. Tr. at 53, 140–41. Her application was denied initially and upon reconsideration. Tr. at 71–75, 78–82. On September 8, 2022, Plaintiff appeared *pro se* for a hearing by telephone before Administrative Law Judge ("ALJ") Nicholas Walter. Tr. at 26–52 (Hr'g Tr.). The ALJ issued an unfavorable decision on October 28, 2022, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 8–25. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–5. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on August 1, 2023. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 46 years old at the time of the hearing. Tr. at 38. She completed a bachelor's degree. *Id.* Her past relevant work ("PRW") was as a human resource ("HR") specialist. Tr. at 47. She alleges she has been unable to work since August 10, 2020. Tr. at 140.

2.    Medical History

On August 7, 2020, nurse practitioner Heather Cannova ("NP Connova") completed paperwork for Plaintiff to take a leave of absence from work under the Family and Medical Leave Act ("FMLA"). Tr. at 316–18. She noted Plaintiff's condition had commenced on July 20, 2020, and was expected to last for an indefinite duration. Tr. at 316. She stated she had started treating Plaintiff on August 7, 2020, and expected to continue treatment every two weeks for 12 weeks. *Id.* She indicated she had prescribed medication, but had not referred Plaintiff to another health care provider. *Id.* She checked a box to indicate Plaintiff was unable to perform any of her job functions due to the condition. *Id.* She described Plaintiff as having "[s]ignificant anxiety with frequent panic attacks lasting for several weeks and not alleviated with current medications." *Id.* She stated Plaintiff "need[ed] time to allow for new medication stabilization." *Id.* She estimated Plaintiff would be incapacitated for 14 days. Tr. at 317.

On December 2, 2020, NP Cannova provided a letter in which she stated she recommended FMLA leave to stabilize symptoms after Plaintiff presented to her under significant anxiety on August 7, 2020. Tr. at 315.

Plaintiff participated in a telehealth visit with psychiatrist Ryan Wade, M.D. ("Dr. Wade"), on February 23, 2021. Tr. at 301–03. She reported feeling particular distressed since being fired by her employer in August 2020. Tr. at 301. She said her constant thoughts about being fired had impaired her sleep and ability to interact with others. *Id.* She described difficulties with trust, inability to experience positive emotions, and avoidance of social situations and interaction with others. *Id.* Dr. Wade recorded normal findings on mental status exam ("MSE"), aside from flat tone and constricted mood and affect. Tr. at 301–02. He noted many of the symptoms Plaintiff described were similar to those consistent with a diagnosis of posttraumatic stress disorder ("PTSD"), although Plaintiff did not meet the full diagnostic criteria. Tr. at 302. He diagnosed adjustment disorder with anxiety. Tr. at 303. He increased Sertraline and referred Plaintiff for psychotherapy. *Id.*

Plaintiff reported feeling better overall, but continuing to experience anxiety around other people on April 7, 2021. Tr. at 311. She noted Xanax was less effective and she often ended up taking two pills, as opposed to one. *Id.* Dr. Wade noted normal findings on MSE, aside from Plaintiff's report of anxious mood. *Id.* He increased Sertraline to 150 mg daily. *Id.*

On April 14, 2021, Plaintiff reported not sleeping much at all and experiencing significant anxiety upon leaving her home. Tr. at 297. She indicated she had frequently required an increased dose of Xanax that had failed to control her symptoms. *Id.* She stated she had decreased social media and television viewing before bed and was working on projects she enjoyed like refinishing furniture. *Id.* She endorsed particularly heightened anxiety when she had to go to the grocery store. *Id.* NP Cannova observed normal findings on MSE, aside from anxious and sullen affect. Tr. at 297–98. She switched Plaintiff's anxiety medication to Lorazepam, as it was longer-acting, and increased Sertraline. Tr. at 298. She encouraged Plaintiff to get out of the house a little at a time and to exercise. *Id.*

Plaintiff followed up with Dr. Wade on May 3, 2021. Tr. at 306. She reported feeling the same as she had at her prior visit. *Id.* She described ongoing difficulty with social anxiety and concern over leaving her home, although she indicated she could leave her home to complete specific tasks. *Id.* She endorsed difficulty initiating and maintaining sleep. *Id.* Dr. Wade encouraged Plaintiff to pursue psychotherapy, but she declined, noting she preferred not to talk about what was bothering her. *Id.* Dr. Wade observed mostly normal findings on MSE, aside from superficially cooperative behavior, terse speech, flat tone, generally constricted mood and affect, guarded thought process, and limited insight regarding her psychiatric

5

condition and patterns of behavior. Tr. at 306–07. He diagnosed unspecified anxiety disorder and indicated a need to rule out adjustment disorder with anxiety, generalized anxiety disorder, and agoraphobia. Tr. at 307. He continued Sertraline and prescribed Mirtazapine 15 mg. *Id.*

On August 3, 2021, state agency psychological consultant Stephen Saxby, Ph.D. ("Dr. Saxby"), completed a psychiatric review technique ("PRT") in which he considered Listing 12.06 for anxiety and obsessive-compulsive disorders. Tr. at 56–57. He rated Plaintiff as having mild limitations in understanding, remembering, or applying information and moderate limitations in interacting with others, concentrating, persisting, or maintaining pace, and adapting or managing oneself. Tr. at 57. Dr. Saxby completed a mental residual functional capacity ("RFC") assessment in which he noted Plaintiff was markedly limited in her ability to interact appropriately with the general public and moderately-limited in her abilities to: understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or in proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; and get

6

along with coworkers or peers without distracting them or exhibiting behavioral extremes. Tr. at 58–59.

On October 2, 2021, Plaintiff reported having lost her sister and father to COVID-19 in August. Tr. at 335. She indicated her psychiatrist had titrated down her Effexor dose and intended to start her on Lexapro and Rixulte. *Id.* She stated Ambien was working well for sleep, but she continued to struggle with significant anxiety. Tr. at 335. NP Cannova recorded normal findings on exam. Tr. at 335–36. She noted Plaintiff was in counseling for bereavement. Tr. at 336. She recommended Plaintiff titrate down Effexor and start on Rixulte with the psychiatrist. *Id.* She refilled Ambien and advised Plaintiff not to take it every day. *Id.*

On December 15, 2021, a second state agency psychological consultant, Lisa Montgomery, Ph.D., reviewed the evidence, completed a PRT, and assessed the same degree of limitation as Dr. Saxby in each area of mental functioning. *Compare* Tr. at 56–57, *with* Tr. at 65–66. She also assessed the same mental RFC. *Compare* Tr. at 58–49, *with* Tr. at 67–69.

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

Plaintiff testified she was 5'8" tall and weighed 190 pounds. Tr. at 38. She confirmed she had a driver's license and drove to her mother's house and

the grocery store. Tr. at 39. She stated she had worked for Culpepper Hospital from 2015 to 2020 as an HR specialist. Tr. at 40. She said she was fired from her job on August 26, 2020, after having expressed concerns over her employer requiring her to conduct COVID-19 patient screenings in the hospital. Tr. at 40–41. She explained her concerns pertained to potentially exposing her diabetic husband and two-year-old grandson, who lived in her home at the time, to the illness. Tr. at 41. She said that after expressing her concerns, she was "ridiculed," "talked down to," and eventually terminated. *Id.*

Plaintiff testified her grandson no longer lived with her, but lived nearby with his father. *Id.* She indicated her sister and father died of COVID-19 in August 2021, and she and her husband moved to South Carolina in December 2021 to be closer to her mother. Tr. at 39, 42.

Plaintiff stated anxiety prevented her from being able to work. Tr. at 42. She said she experienced agoraphobia that had worsened due to COVID-19 and her family members' deaths such that she had difficulty being around people and rarely left her home. Tr. at 43. She indicated she also had difficulty sleeping, gritted her teeth, had little interest, felt tired all the time, was irritable, and had panic attacks. Tr. at 43–44. She explained her panic attacks were triggered by being around other people and dreading upcoming events. Tr. at 44.

Plaintiff testified her husband did the majority of the grocery shopping, although she occasionally visited the grocery store or picked up orders at stores if she needed something and her husband was not home. *Id.* She stated she visited her mother at least once a week. *Id.* She indicated she engaged in light cleaning and generally cooked dinner. *Id.* She denied entertaining visitors during the day. *Id.* She said she watched television. Tr. at 45. She stated her husband worked and she was home by herself for the majority of the day. *Id.*

b.    Vocational Expert Testimony

Vocational Expert ("VE") Benjamin Johnson, Ph.D., reviewed the record and testified at the hearing. Tr. at 46–50. The VE categorized Plaintiff's PRW as an HR specialist, *Dictionary of Occupational Titles* ("*DOT*") No. 166.267-046, requiring light exertion and a specific vocational preparation ("SVP") of 7. Tr. at 47. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could sustain concentration, persistence, and pace for periods of two hours at a time to perform simple, routine tasks; could have no customer service interaction with the public; could not work in close coordination with coworkers; could only perform work requiring no more than occasional interaction with coworkers and supervisors; and could perform low-stress work, defined as requiring occasional decision making and occasional changes in work setting. Tr. at 48–

49. The VE testified that the hypothetical individual would be unable to perform Plaintiff's PRW. Tr. at 49. The ALJ asked whether there were any other jobs the hypothetical person could perform. *Id.* The VE identified jobs at the light exertional level with an SVP of 2 as a cloth folder, hand, *DOT* No. 589.687-014, a stock clerk, *DOT* No. 299.667-014, and an inspector/packer, *DOT* No. 559.687-074, with 39,000, 35,000, and 41,000 positions in the national economy, respectively. *Id.* The ALJ asked the VE if his testimony had been consistent with the *DOT. Id.* The VE stated it had been, except that the *DOT* did not identify the number of jobs present in each occupation. *Id.*

For a second hypothetical question, the ALJ asked the VE to consider an individual of Plaintiff's vocational profile who was limited as described in the first question and would be off-task 20% of the time, in addition to normal breaks or, in the alternative, would have three or more absences per month. Tr. at 50. He asked if either condition would allow for competitive employment. *Id.* The VE testified neither would. *Id.*

       2.    The ALJ's Findings

In his decision, the ALJ made the following findings of fact and conclusions of law:

    1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2025.
    2.    The claimant has not engaged in substantial gainful activity since August 10, 2020, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.   The claimant has the following severe impairments: anxiety and adjustment disorder (20 CFR 404.1520(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: can sustain concentration, persistence, and pace for periods of two hours at a time with simple routine tasks; can have no customer service interaction with the public and also could not perform jobs that involve working in close coordination with coworkers, and therefore could only perform work requiring no more than occasional interaction with coworkers and supervisors; can perform low-stress work defined as occasional decision making and occasional changes in work setting.

6.   The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.   The claimant was born on July 5, 1976 and was 44 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1564).

8.   The claimant has at least a high school education (20 CFR 404.1564).

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from August 10, 2020, through the date of this decision (20 CFR 404.1520(g)).

Tr. at 13–20.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ failed to properly consider her qualifying statements as to her activities of daily living ("ADLs") and account for them in the RFC assessment; and

2)    the ALJ improperly discounted her symptom severity based on her lack of treatment without considering whether her lack of treatment resulted from her mental impairments.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v.*

12

*Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[3] (4) whether such impairment prevents claimant from performing PRW;[4] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can

---

[3] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[4] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that his conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the

decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Consideration of ADLs

Plaintiff argues the ALJ discounted the severity of her impairments based on her ADLs without adequately considering their nature and extent or explaining how her ability to perform such activities indicated she could perform full-time, competitive work. [ECF Nos. 11 at 5–15 and 15 at 1–3]. She claims the ALJ ignored or minimized qualifying information as to her ability to perform ADLs. [ECF No. 11 at 8–14]. She maintains the ALJ failed to explain how her ability to perform limited ADLs showed she could perform full-time, competitive employment. *Id.* at 14–15.

The Commissioner argues the ALJ reasonably considered Plaintiff's ADLs, did not misstate material facts in discussing them, and was not required to discuss every detail of her qualifying remarks. [ECF No. 10 at 9–11]. He asserts Plaintiff's ADLs informed the ALJ's RFC assessment, but Plaintiff still bore the burden of proving she was disabled. *Id.* at 11–12. Consequently, he maintains the ALJ was not required to explain why her alleged ADLs, considered in isolation, demonstrated Plaintiff was not disabled. *Id.* at 12. He distinguishes this case from *Arakas v. Commissioner,*

16

*Social Security Administration*, 983 F.3d 83 (4th Cir. 2020), in that, unlike the ALJ in that case, this ALJ did not place undue emphasis on Plaintiff's ADLs or misstate the record in discussing them. *Id.*

"[A]n ALJ follows a two-step analysis when considering a claimant's subjective statements about impairments and symptoms." *Lewis v. Berryhill*, 858 F.3d 858, 865–66 (4th Cir. 2017) (citing 20 C.F.R. § 404.1529(b), (c)). "First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms." *Id.* at 866 (citing 20 C.F.R. § 404.1529(b)). If the ALJ concludes the claimant's impairments could reasonably produce the symptoms she alleges, he continues to the second step in which he must "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform basic work activities." *Id.* (citing 20 C.F.R. § 404.1529(c)).

At the second step, the ALJ considers "whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence." 20 C.F.R. § 404.1529(c)(4). In undertaking this inquiry, the ALJ should consider "statements from the individual, medical sources, and any other sources that might have information about the claimant's symptoms, including agency personnel," as well the claimant's ADLs, among several other factors. 20

C.F.R. § 404.1529(c)(3); SSR 16-3p, 2017 WL 5180304, at *6. A claimant's ADLs are particularly relevant to the ALJ's evaluation of the intensity and persistence of the claimant's symptoms in assessing her RFC. 20 C.F.R. § 404.1529. The ALJ should cite non-medical evidence, including ADLs, in addition to "specific medical facts (*e.g.*, laboratory findings)" and must explain how all the relevant evidence in the case record supports the RFC assessment. SSR 96-8p, 1996 WL 374184, at *7 (1996).

The Fourth Circuit has found that "[a]n ALJ may not consider the type of activities a claimant can perform without also considering the extent to which she can perform them." *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018). The court subsequently found in *Arakas*, 983 F.3d at 101, that the ALJ erred by "improperly disregard[ing the claimant's] qualifying statements regarding the limited extent to which she could perform daily activities" and in "fail[ing] to adequately explain how her limited ability to carry out daily activities supported his conclusion that she could sustain an eight-hour workday." The court further noted "[a] claimant's inability to sustain full-time work due to pain and other symptoms is often consistent with her ability to carry out daily activities." *Id*.

The Fourth Circuit has also noted "[a]n ALJ has an obligation to consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to

a disability finding." *Lewis*, 858 F.3d at 869. However, "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision." *Reid v. Commissioner of Social Sec.*, 769 F.3d 861, 865 (quoting *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (per curiam); *accord Russell v. Chater*, No. 94-2371, 1995 WL 417576, at *3 (4th Cir. July 7, 1995) (per curiam) (explaining the court had not "establish[ed] an inflexible rule requiring an exhaustive point-by-point discussion in all cases")).

Although the ALJ did not specifically outline in his decision every qualifying statement Plaintiff made regarding her ability to perform ADLs, his decision demonstrates that he thoroughly considered her representations and did not cherrypick the evidence. In addressing Plaintiff's limitations in interacting with others, the ALJ wrote: "The claimant reported distrust of others, severe anxiety in public, and not wanting to go out alone (Exhibit 1E)." Tr. at 14. He acknowledged Plaintiff's report of "low motivation (Exhibit 1E, 1F, 11E)" in addressing her ability to adapt or manage herself. Tr. at 15.

In summarizing the medical evidence, the ALJ recounted Plaintiff's representations in function and disability reports that she was unable to "function in any type of stressful situation," had "grief issues, and increased anxiety after losing a number of family members due to COVID (Exhibit 2B, 5B, 2E, 14E)," and that her "conditions affect her ability to talk, complete tasks, concentrate, and get along with others (Exhibit 1E)." Tr at 16. He

noted Plaintiff's reports to medical providers of "impaired ability to interact with others," "difficulty trusting other people," "avoidance of social situations," "continued anxiety around others," "increased anxiety and panic" that "cause[d] sleep disturbances and affected her ability to go out in public," and "concern about leaving her home." Tr. at 16–17. He stated he had reviewed and considered the third-party function report completed by Plaintiff's husband, Tr. at 19, which included qualifying statements as to Plaintiff's ADLs. *See Reid*, 769 F.3d at 865 ("[A]bsent evidence to the contrary, we take [the ALJ] at [his] word" when he declares he has considered certain evidence) (citing *Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005) ("[O]ur general practice, which we see no reason to depart from here, is to take a lower tribunal at its word when it declares it has considered a matter.")).

Despite his recognition of Plaintiff's and her husband's qualifying statements as to her ability to engage in ADLs and to function socially, the ALJ ultimately concluded, in accordance with 20 C.F.R. § 404.1529(c), that some of her allegations were inconsistent with her ADLs and the other evidence of record. With respect to Plaintiff's alleged limitations in social functioning, the ALJ acknowledged: "[S]he is able to go places alone and drive when necessary (Exhibit 1E/14). She spends time with family members, helps care for her young grandson, and socializes with others in person and over

the telephone, video chat, and text message (Exhibits 1E, 5E, 11E)." Tr. at 14. He wrote: "The claimant drives herself places when needed, enjoys reading and refinishing furniture, and watches her grandson (Exhibits 5E; Hearing Testimony)." Tr. at 15. He explained: "The claimant participates in enjoyable activities including reading and refinishing furniture, and she performs a number of household chores including cleaning, washing dishes, laundry, cooking, shopping, handles her financial affairs." *Id.* In discussing Plaintiff's May 2021 visit with Dr. Wade, the ALJ wrote: "Although she reported anxiety in social situations and concern about leaving her home, she confirmed that she was able to go places when needed." *Id.*

Plaintiff urges the court to consider this case comparable to *Woods*, *Arakas*, and *Shelly C. v. Commissioner of Social Security Administration*, 61 F.4th 341 (4th Cir. 2023). However, in those cases, the court acknowledged the presence of extensive records supporting the claimants' allegations. *See Shelly C.*, 61 F.4th at 355 (noting the record contained "extensive exhibits"); *Arakas*, 983 F.3d at 111 ("Arakas's extensive medical records corroborate the severity, persistence, and limiting effects of her impairments."); *see also Woods*, 888 F.3d at 689–90 (noting and briefly summarizing the evidence presented).

Here, the ALJ explained that the record was not extensive, writing:

The claimant bears the responsibility of providing medical evidence showing the presence and severity of an impairment

during the time of alleged disability. A physical or mental impairment must be established by medical evidence consisting of signs and laboratory findings and not only by the claimant's statement of symptoms (see 20 CFR 404.1508).[5] In addition, the claimant must show that the impairment prevents her from performing work for twelve continuous months under 20 CFR 404.1505. In the present case, the claimant's medical condition is documented on only a few occasions and not at all in the past year. As discussed above, her records show she had some low mood and anxiety but consistently displayed normal orientation, concentration, attention, memory, thought content and processes. The record contains no medical evidence as required by section 404.1508 of any mental impairment that persisted at a disabling level of severity for 12 continuous months.

Tr. at 17–18.

The record contains only five treatment notes reflecting a period of less than eight months. Although NP Cannova completed a form supporting FMLA leave beginning on August 7, 2020, there is no corroborating treatment note. Tr. at 316–18. The evidence shows Plaintiff participated in telehealth visits with Dr. Wade on February 23, April 7, and May 3, 2021, and in-person visits with NP Cannova on April 14 and October 2, 2021. *See* Tr. at 297–98, 301–03, 306–07, 311, 335–36. The ALJ considered the infrequency of Plaintiff's treatment, her failure to pursue additional recommended treatment, and her providers' observations during exams to be further inconsistent with her statements as to the limiting effects of her symptoms. *See* Tr. at 16–17.

---

[5] The reference to 20 C.F.R. § 404.1508 is incorrect, as it is currently a reserved section of the regulations. It seems the ALJ intended to reference 20 C.F.R. § 404.1521.

Contrary to Plaintiff's argument, the ALJ was not required to account for all her qualifying statements and alleged limitations in the RFC assessment, given his finding that some of her statements were not consistent with the other evidence. He adequately explained how he considered the restrictions in Plaintiff's ADLs that were supported by the record in assessing her RFC. He noted he had considered Plaintiff's reported ADLs and alleged limitations in interacting with others "in finding she cannot perform jobs involving customer service interaction with the public and . . . jobs that involve working in close coordination with coworkers." Tr. at 14. He explained:

> The undersigned has considered the claimant's history of adjustment disorder and anxiety with social issues in finding she can sustain concentration, persistence, and pace for periods of two hours at a time with simple routine tasks; can have no customer service interaction with the public and also could not perform jobs that involve working in close coordination with coworkers, and therefore could only perform work requiring no more than occasional interaction with coworkers and supervisors; can perform low-stress work defined as occasional decision making and occasional changes in work setting.

Tr. at 18. He further wrote: "Overall, the record would support she could not return to her prior skilled work involving great social interaction in a human resources department, but the record would not support that she could not perform unskilled work with limited social interaction as allowed for by the residual functional capacity." Tr. at 19.

Based on the foregoing, the undersigned finds the ALJ's decision reflects his consideration of Plaintiff's ADLs in accordance with 20 C.F.R. § 404.1529, SSRs 96-8p and 16-3p, and Fourth Circuit precedent.

### 2.    Lack of Treatment

Plaintiff argues the ALJ erred in discounting her impairment severity based on her lack of treatment without considering whether her mental impairments caused her not to pursue treatment. [ECF No. 11 at 15–23 and ECF No. 15 at 3–6]. She contends the ALJ was required to consider reasons for her infrequent treatment in accordance with SSR 16-3p and applicable case law. [ECF No. 11 at 18–23]. She maintains the reasons she provided for failing to pursue counseling and additional treatment demonstrate her lack of understanding for mental health treatment protocols. [ECF No. 15 at 5].

The Commissioner maintains the ALJ reasonably considered Plaintiff's limited treatment, as Plaintiff carries the burden of proving disability. [ECF No. 14 at 13]. He asserts the ALJ specifically considered Plaintiff's indication to Dr. Wade that she "prefers not to talk about what is bothering her." *Id.* at 14. He argues Plaintiff's reasons for declining to pursue additional medical treatment do not fall within the examples provided in SSR 16-3p, and the ALJ noted Plaintiff's statement to Dr. Wade suggested her failure to pursue additional treatment was a "willful act." *Id.* at 15. He contends the ALJ noted Plaintiff was routinely calm and cooperative with her treatment providers,

which undermines her allegation that her anxiety was an impediment to treatment. *Id.* at 16. He further notes Plaintiff received psychiatric treatment through telemedicine, which Dr. Wade considered to be appropriate. *Id.*

> Pursuant to SSR 16-3p:
>
> We will consider an individual's attempts to seek medical treatment for symptoms and to follow treatment once it is prescribed when evaluating whether symptom intensity and persistence affect the ability to perform work-related activities . . . . Persistent attempts to obtain relief of symptoms, such as increasing dosages and changing medications, trying a variety of treatments, referrals to specialists, or changing treatment sources may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent.
>
> In contrast, if the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, or if the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record. We will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints.

2017 WL 5180304, at *9.

The SSR further provides that the ALJ "may consider" that "[d]ue to various limitations (such as language or mental limitations), an individual may not understand the appropriate treatment for or the need for consistent treatment of his or her impairment" and "[d]ue to a mental impairment (for example, individuals with mental impairments that affect judgment, reality

25

testing, or orientation), an individual may not be aware that he or she has a disorder that requires treatment." *Id.* It states: "We will consider and address reasons for not pursuing treatment that are pertinent to an individual's case." *Id.*

The record contains several representations from Plaintiff as to her failure to pursue additional mental health treatment. In May 2021, she declined Dr. Wade's offer to refer her for psychotherapy, noting she preferred not to talk about what was bothering her. Tr. at 306. In a letter dated May 30, 2022, Plaintiff represented she had been unable "to go to the doctor since July 1 I believe." Tr. at 277. She stated: "I just can't bring myself to go at this time." *Id.* She noted her "panic attacks" had reached "an all time high" after her father and sister passed away from COVID-19 on August 11. *Id.* She stated she had been without insurance for a month following her December 2021 move and her husband's job change. *Id.* During the September 2022 hearing, she indicated to the ALJ that she had not obtained any medical treatment since October 2021. Tr. at 34–35.

Here, in accordance with SSR 16-3p, the ALJ reasonably concluded the alleged intensity and persistence of Plaintiff's symptoms was inconsistent with the overall evidence because the frequency and extent of her treatment did not compare to her subjective complaints, and she failed to follow recommended treatment that might improve her symptoms. *See* Tr. at 16–18.

He noted that despite NP Cannova's August 2020 notation on the FMLA paperwork that Plaintiff "should return for follow up treatment every two weeks for the next three months (Exhibit 1E/25–27; duplicated at 2F), there is no evidence in the record of any additional care with that provider until eight months later." Tr. at 16. He indicated Plaintiff returned to NP Cannova in April 2021 "and, although [NP Cannova] instructed the claimant to follow up in three months (Exhibit 1F/15–16), there is no evidence of any additional treatment at that facility until six months later, when the claimant reported continued anxiety but improved sleep with Ambien (Exhibit 3F/16)." Tr. at 17. He pointed out that during Plaintiff's "final psychiatric visit with Dr. Wade in May 2021," "Dr. Wade recommended the claimant begin mental health counseling; however, she declined, stating she 'prefers not to talk about what is bothering her.' (Exhibit 1E/14–17)." *Id.* He noted "[t]he record contains no evidence of any further treatment with a mental health professional." *Id.*

> He further explained:
>
> Noteworthy in this case is the scarcity of medical observations, due to the fact the claimant has not sought frequent treatment. Indeed, the record documents lapses in treatment for periods of six to eight months at a time, and she only underwent psychiatric care on three occasions over a four month period. It would appear that if the claimant were indeed experiencing severe symptoms of anxiety, depression, or any other psychological condition, she would have undergone consistent treatment, heeded her psychiatrist's recommendations, and sought all available treatment in an attempt to obtain any relief she could. In

27

> addition, because of the claimant's lack of ongoing treatment, the
> record fails to establish the existence of anxiety, depression, or
> other emotional disorder that could not be improved, if not totally
> controlled, with ongoing adherence to an appropriate mental
> health treatment regimen.

Tr. at 17–18.

Relying on this court's decisions in *Daniels v. Berryhill*, C/A No. 4:18-174-RMG (D.S.C. July 1, 2019), and *Girard v. Saul*, C/A No. 0:20-1905-DCC-PJG (D.S.C. May 25, 2021), *report and recommendation adopted by* 2021 WL 11531601 (June 9, 2021), Plaintiff maintains the ALJ failed to consider that her mental impairments prevented her from understanding the need for additional treatment. The ALJ appears to have rejected any such argument, writing:

> The claimant has above average intelligence and a college degree
> (Exhibit 1F; Hearing Testimony) . . . . There is no evidence
> indicating the claimant is unable to understand and learn, follow
> instructions, carry out tasks, solve problems, assess priorities,
> and/or use reason and judgment to make decisions. She is able to
> follow instructions, answer questions, and provide explanations.

Tr. at 14. He further considered Plaintiff's decision not to pursue additional treatment to be willful, as he cited her indication to Dr. Wade that she did not desire to a talk to a psychotherapist about her problems. *See* Tr. at 17.

While the ALJ did not explicitly address Plaintiff's indication that she "could not bring herself to go" to the doctor, Tr. at 277, he recognized her "reported inability to function in any type of stressful situation, grief issues, and increased anxiety after losing a number of her family members due to

28

COVID." Tr. at 16. However, he also noted her hearing testimony that she "drives herself places *when needed*." Tr. at 15 (emphasis added). In response to the ALJ's question as to what kind of things Plaintiff was leaving the house for, she testified: "Like I said, I go visit my mother. If I have to go, like if my husband's not home or available and something's needed at the grocery store or something, I might run in or do a pickup." Tr. at 44. It was completely reasonable for the ALJ to conclude that an individual who retained the ability to pick up items from a store when they were needed needed was not so paralyzed by anxiety that she could not visit a doctor and that her decision not to pursue additional treatment was willful.

In light of the foregoing, the undersigned finds substantial evidence supports the ALJ's consideration of the frequency and extent of Plaintiff's medical treatment in accordance with SSR 16-3p.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether his decision is supported as a matter of fact and law. Based on the foregoing, the undersigned affirms the Commissioner's decision.

IT IS SO ORDERED.

February 15, 2024                          Shiva V. Hodges
Columbia, South Carolina              United States Magistrate Judge